IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KIMBERLY CLARK,** | : CIVIL ACTION NO. 4:23-CV-871 |
| **Plaintiff** | : |
| | : (Judge Neary) |
| v. | : |
| | : |
| **GEISINGER HEALTH SYSTEM,** | : |
| **GEISINGER CLINIC d/b/a** | : |
| **GEISINGER MEDICAL CENTER,** | : |
| **GEISINGER HEALTH CARE,** | : |
| **STEPHANIE PACOVSKY, and** | : |
| **TOYIN ALAIYEGBAMI** | : |
| | : |
| **Defendants** | : |

## MEMORANDUM

Plaintiff Kimberly Clark brings this suit against her former employer, Geisinger Health System, Geisinger Clinic d/b/a Geisinger Medical Center, and Geisinger Health Care (collectively "Geisinger"), as well as specific individuals, Stephanie Pacovsky and Toyin Alaiyegbami (all together, "Defendants") under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.* Ms. Clark alleges discrimination, retaliation, and failure to accommodate under the ADA against Geisinger (Count I), interference and retaliation under the FMLA against Defendants (Count II), and discrimination, retaliation, and failure to accommodate under the PHRA against Defendants (Count III). Defendants moved for summary judgment on all counts. The motion will be granted in part and denied in part.

I. **Factual Background & Procedural History**[1]

Ms. Clark began working for Geisinger in their Lewistown Hospital's medical surgical unit and the oncology department in 2014 as a registered nurse ("RN"). (Doc. 26 ¶¶ 10-11). While at Lewistown, her performance evaluations noted consistently satisfactory performance on multiple metrics. (Doc. 33-6). However, she was given a verbal warning for excessive absences in April 2015, and another verbal warning in January 2016,[2] with a specific notation in her 2016 performance evaluation for the latter. (Doc. 33-1 ¶ 12-15). Around the same time, Ms. Clark began to experience substantial anxiety and depression related to family medical issues. (Doc. 33-4 (Plaintiff's Deposition, hereinafter, "Clark Dep.") 27:6-28:3, 71:15-18). She would receive diagnoses for anxiety, depression, and a panic disorder in 2018, for ADHD in 2019, and for PTSD around 2020. (Id. 14:2-18).

At Geisinger, FMLA leave requests are processed by a third-party vendor, Matrix Absence Management. (Doc. 26 ¶ 31). Pursuant to its FMLA leave policy, Geisinger generally returns employees coming back from FMLA leave to the same

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 26, 33-1). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] Both warnings were for excessive absences, which Geisinger defines as four absences in a six-month period. (Doc. 26 ¶¶ 12-14).

position as when the employee's leave commenced, or one equivalent in benefits, pay, and conditions. (Id. ¶ 32). In 2016, Ms. Clark requested, and Geisinger approved via Matrix, FMLA leave for her to take care of her sister from June through November. (Id. ¶ 16). Later she sought, and Geisinger approved via Matrix, intermittent FMLA leave consisting of two events of two days per month between June 2017 and December 2017. (Doc. 26 ¶¶ 18, 143). When Ms. Clark exhausted her FMLA leave, Geisinger granted her additional medical leave as an accommodation to her conditions. (Id. ¶¶ 25-30). In total, Ms. Clark requested, and received approval for, FMLA or other accommodating leave in at least part of every year from 2016 to 2022.[3] (Id. ¶¶ 16-30, 132-33).

Still, Ms. Clark received strong performance evaluations from Geisinger during her time in Lewistown. (Doc. 33-1 ¶ 12). These strong ratings came notwithstanding comments about Ms. Clark's attendance, noting explicitly her use of FMLA leave. (Doc. 33-6 at DEF 515, 523, 558). Further, Ms. Clark asserts (though Geisinger disputes) her supervisor at Lewistown, Karen Napikoski, (Doc. 26 ¶ 11), would make constant, negative comments about Ms. Clark's need for FMLA leave. (Clark Dep. 58:13-25; 59:4-11). These include comments like "you need to be reliable

---

[3] The specific periods of Ms. Clark's FMLA leave while at Geisinger occurred on June 2016 to November 2016, (Doc. 26 ¶ 16), intermittent leave from June 2017 to December 2017, (Id. ¶ 18), intermittent leave from August 2018 to February 2019, (Id. ¶ 19), intermittent leave from May 2019 to November 2020, (Id. ¶¶ 20-21), and a period of continuous leave from November 2020 to February 2021, (Id. ¶ 23). She also received extended medical leave as an accommodation starting in April of 2021 which lasted until July 2021. (Id. ¶¶ 24-28).

no matter what your situation is medically, or your family problems" and "you don't want to put more burden on your co-workers and other nurses." (Id.).

### A. Ms. Clark's Time in State College

Needing a change of pace, in July 2021, Ms. Clark interviewed and Geisinger hired her to be a Clinic RN at the Geisinger 65-Forward location in State College. (Doc. 26 ¶¶ 35-36, 38). Geisinger's 65-Forward program is an outpatient clinic for individuals 65 years and older. (Id. ¶ 85). Ms. Clark underwent training in Danville and Milton before beginning at the State College location in October. (Doc. 26 ¶ 38). There, Ms. Clark's supervisors included Devin Rhoads and Stephanie Pacovsky. (Id. ¶ 42). Mr. Rhoads was hired as a Geisinger 65-Forward Operations Manager in June 2021, and was the manager of the State College 65-Forward location until June 2022. (Id. ¶ 39). Ms. Pacovsky served first as the Operations Director in June of 2019 and then became the Operations Manager for the Geisinger 65-Forward clinics in June 2022. (Id. ¶¶ 40-41). Employee Relations Specialist Toyin Alaiyegbami was also employed by Geisinger at that time, and her role was to manage the supervisors when it came to interactions with employees, deal with disciplinary actions, and approve disciplinary actions. (Id. ¶¶ 68-70).

Also in 2021, Geisinger began to evaluate a reorganization of the 65-Forward clinics. (Id. ¶ 87). Operations Managers such as Mr. Rhoads were responsible for supervising four to five clinics at a time, meaning that an Operations Manager was not present at each clinic on a day-to-day basis. (Id. ¶ 94). By contrast, each individual clinic had one Clinic RN whose only function was nursing. (Id. ¶ 89). As part of the reorganization, the Clinic RN role was eliminated in favor of a RN Lead

4

role. (Id. ¶ 91). The new RN Lead role would be substantively different from the Clinic RN role as the former came with supervisory duties and more hands-on patient interaction. (Id. ¶ 95). The decision to eliminate the Clinic RN role in favor of the RN Lead role was purely a business one, to maximize efficiency. (Id. ¶¶ 90-92). That is, an RN Lead at each clinic would provide day-to-day leadership that a travelling Operations Manager, responsible for four to five clinics, could not. (Id. ¶ 93).

Due to the elimination of the position and the vastly different job responsibilities, every Clinic RN would have to apply and be interviewed if they wished to be employed as an RN Lead. (Id. ¶ 114). No Clinic RN employed by Geisinger would be considered for the RN Lead by virtue of their current employment. (Id. ¶ 106). Clinic RN's who did not secure an RN Lead or other position with Geisinger within thirty days of the announcement of the Clinic RN position would be entitled to a severance payment pursuant to Geisinger policy. (Id. ¶ 112).

While discussions about creating the RN Lead position were underway, Ms. Clark's time at State College was off to a rocky start. She sent an email to Ms. Pacovsky on March 5th, 2022, recounting some struggles she was having with her new job. (See Doc. 33-16). At the same, in that very email, Ms. Clark states "It feels good living without an FMLA for anxiety and depression. I feel so much healthier, mentally, and physically being on a normal sleep schedule." (Id.).

Though she was apparently feeling better, Defendants claim that there were numerous performance-related issues with Ms. Clark's work. (Doc. 26 ¶¶ 46-50). A

5

co-worker of Ms. Clark's, Sarah Dombrowski, emailed a supervisor listing incidents when she made mistakes and had other issues with vaccine administration.[4] (Id. ¶ 54). While Ms. Clark denies these events took place, nowhere does she offer an explanation for her co-worker's email or otherwise explain why it was sent. Ms. Clark's errors led to Defendants placing her on a Performance Improvement Plan ("PIP") on June 21st, 2022. (Id. ¶ 75). Ms. Pacovsky was the main author of the PIP, with input from Ms. Alaiyegbami and documentation from Mr. Rhoads. (Id. ¶ 68). The PIP form includes a section for comments by the employee subject to the PIP. (Doc. 26-1 at Appx. 540-41). Nowhere in her comments to the PIP does Ms. Clark dispute the incidents listed on document; rather, Ms. Clark objects to the consistency and volume of new information communicated to her regarding tasks at the clinic. (Id.).

Around the time she was placed on the PIP, Ms. Clark's health troubles increased. (Clark Dep. 116:16-117:14). About two weeks prior, Ms. Clark emailed Ms. Pacovsky requesting a day off from work because "I'm going through a difficult time and unfortunately, I need many medical tests completed." (Doc. 33-12). The tests Ms. Clark lists as needed were gynecological and not related to her disabilities or mental health. (Id.). Later, she requested, and received approval via Matrix, FMLA leave from June 30th, 2022, to September 2nd, 2022. (Doc. 26 ¶¶ 132-33). On

---

[4] These incidents include: failing to pend a script for Shingrix vaccine, missing the refill on a Shingrix vaccine, missing a .65F vaccine on Tdap, being unable to document a flu shot, mixing up the patient requiring the vaccine, administering a 3rd Shingrix vaccine to a patient in error, and administering a Tdap to a patient without processing the order. (See Doc. 26-1 at Appx. 618-20).

June 24th, 2022, Ms. Pacovsky emailed all Clinic RN's announcing the elimination of the position. (Id. ¶ 113). Ms. Clark returned to her Clinic RN position on October 3rd, 2022, despite its elimination. (Id. ¶ 136). She was given 30 days from her return to find a new role within Geisinger. (Id. ¶ 137). Yet her supervisor claimed she was not qualified for the RN Lead role, or any other position, given the issues outlined in her PIP. (Id. ¶¶ 121-24). Ms. Clark did not receive an offer of employment for a new position from Geisinger and was laid off on November 11th, 2022. (Id. ¶ 141).

### B. Ms. Clark's Accusations Against Defendants[5]

For Ms. Clark, her troubles with defendants began well-before November 2022. According to her, a previous supervisor in Lewistown repeatedly made derogatory comments to her about her FMLA leave and absences. (Clark Dep. 58:13-25; 59:4-11). These comments continued for years, including when Ms. Clark sought leave after the death of her sister. (Id.).

When Ms. Clark became a Clinic RN at 65-Forward, she informed her supervisors of her condition (though she never says specifically what that condition is). (Clark Dep. 145:13-146:3). The derogatory comments, however, did not stop. Per Ms. Clark, one co-worker would say things like "I don't know why you can't learn. Maybe it's your anxiety or ADHD." (Doc. 33-19 at DEF 740). When she was told her job was being eliminated, she was told she could not apply for the RN Lead promotion due to her being issued a PIP. (Doc. 33-22). Yet, a Human Resources staff member for Geisinger confirmed that was "not necessarily true." (Id.). To Ms. Clark,

---

[5] The facts in this section are disputed by Defendants.

this shows the PIP was pretextual and being used as an excuse to not hire her for the RN Lead role. (Doc. 33-1 ¶¶ 145-46).

She then filed this suit against Defendants on May 5, 2023. Discovery having closed, Defendants moved for summary judgment. Ms. Clark submitted her response, and this matter is now ripe for adjudication.

## II. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is material if resolution of it "might affect the outcome of the suit under the governing law" and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Mall Chevrolet, Inc. v. General Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court's duty is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 242-43.

There are "two closely related methods for a movant to succeed at summary judgment." Mall Chevrolet, 99 F.4th at 630. "First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law." Id. (citing FED. R. CIV. P. 56(a)). "Second,

under the Celotex approach, a moving party may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case *on which that party will bear the burden of proof at trial.*'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

The nonmoving party can defeat a motion for summary judgment by producing evidence to establish a genuine issue of material fact. Anderson, 477 U.S. at 256. The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The party "must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Moreover, if the nonmovant's version of disputed facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

### III. Discussion

In her amended complaint, Ms. Clark brings three claims against the defendants: (1) disability discrimination and retaliation under the ADA; (2) interference and retaliation under the FMLA; and (3) disability discrimination and

9

retaliation under the PHRA.[6] Since the analysis for the ADA claim and the PHRA claim is the same, those shall be addressed together. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002).

### A. ADA/PHRA Claims

The ADA and the PHRA prohibit an employer from discharging an individual due to her disability, or from retaliating against an employee for engaging in statutorily protected activities like requesting or using reasonable accommodations. See 42 U.S.C. § 12112(a), 12203(a); 43 P.S. § 955(a), (d). Courts analyze discrimination and retaliation claims under the ADA using the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Fowler v. AT&T, Inc.,19 F.4th 292, 298 (3d Cir. 2021) (analyzing ADA discrimination claims using burden-shifting framework); Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (analyzing ADA retaliation claims using burden-shifting framework).

The first step of the McDonnell Douglas test requires the plaintiff to establish a *prima facie* case of discrimination or retaliation. See McDonnell Douglas, 411 U.S. at 802. A plaintiff makes out a *prima facie* case of discrimination under the ADA by presenting sufficient evidence that (1) she has a disability within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, with or

---

[6] Ms. Clark originally alleged failure to accommodate claims under the ADA and PHRA, as well as retaliation claims based on Geisinger's failure to hire her for positions other than the RN Lead position; she is no longer proceeding on those claims. (Doc. 33 at 4 n.1).

10

without reasonable accommodations, and (3) she suffered an adverse employment action as a result of discrimination. Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022) (quoting Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015)). A plaintiff alleging retaliation under the ADA generally must establish that (1) she engaged in a protected activity, and the retaliator knew of the involvement; (2) adverse action was taken by the defendant either during or after the protected activity that was sufficient to deter a person of ordinary firmness from engaging in the protected activity; and (3) a causal connection between the protected activity and the adverse action. Derrick F. v. Red Lion Area Sch. Dist., 586 F. Supp. 2d 282, 300 (M.D. Pa. 2008); see also Shaner, 204 F.3d at 500.

"Causation is required for both discrimination and retaliation claims under the ADA." Emmell v. Phoenixville Hosp. Co., 303 F. Supp. 3d 314, 332 (E.D. Pa. 2018). "Close 'temporal proximity,' between the protected status or action by the employee and the adverse action by the employer, is suggestive but not determinative of causation." Id. (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)); see also Quick v. GEO Grp., *Inc.*, 2020 WL 532343, at *17 (W.D. Pa. Feb. 3, 2020) ("There are two ways to establish a causal connection under the ADA: (1) where the temporal proximity of the alleged disability and the adverse employment action are 'unduly suggestive,' no other evidence is required; or (2) where the timing is not 'unusually suggestive,' but there is other evidence of

discrimination or a 'pattern of antagonism.'") (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503–04 (3d Cir. 1997)).

If the plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its decision. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (quoting McDonnell Douglas, 411 U.S. at 802). The defendant's burden at the rebuttal stage is "'relatively light'"; it is a burden of production only. See Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006)). If the employer meets its burden, the plaintiff then must show by a preponderance of the evidence the employer's stated reasons were mere pretext for discrimination. See Fuentes, 32 F.3d at 763.

To demonstrate pretext and defeat summary judgment, a plaintiff must identify evidence that would allow the factfinder to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." See Shaner, 204 F.3d at 501 (3d Cir. 2000) (quoting Fuentes, 32 F.3d at 764). The plaintiff may call attention to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 764).

Here, even assuming she can establish her *prima facie* case for discrimination and retaliation, Ms. Clark cannot overcome Defendants' proffered

nondiscriminatory and nonretaliatory reasons for terminating her.[7] Defendants have been consistent that Ms. Clark was not hired for the RN Lead role due to the issues outlined in her PIP. (Doc. 26 ¶¶ 120-24).

None of Ms. Clark's attempts to cast doubt on that rationale hold water. First, she argues Defendants were inconsistent in their reasoning for not hiring her, stating at one point Defendants told her it was because of the PIP and then because she was unqualified for the role. (Doc. 33-1 ¶ 115). Defendants sufficiently establish those reasons are one in the same. (Doc. 34 at 16). The issues outlined in the PIP created legitimate doubts as to whether Ms. Clark would be qualified for the RN Lead role. Ms. Clark also claims there was a culture of discrimination at Geisinger and references her experience at the Geisinger-Lewistown Hospital. (Doc. 33 at 37). Yet, she does not establish a connection of how those experiences carried over or relate to her time in State College. As such, they are irrelevant for her ADA/PHRA claims and may be set aside.

Next, Ms. Clark tries to attack the PIP itself, calling it "unwarranted." (Doc. 33 at 24). Yet Ms. Clark does not paint a compelling picture showing the PIP was pretextual. Reviewing the record, it does not establish anyone involved with the PIP knew Ms. Clark had a disability. Nearly all the documentary evidence she cites to prove the people behind the PIP were familiar with her condition came *after* the

---

[7] Further, Ms. Clark's claim related to termination fails because it is undisputed that all Clinic RN positions were terminated and any person wishing to be hired as a RN Lead would have to reapply. (Doc. 26 ¶¶ 111, 114). Therefore, there is no casual connection between Ms. Clark's termination and her disability.

issuance of the PIP. (Doc. 33-1 ¶ 117) (only Exhibits K (Doc. 33-12) and O (Doc. 33-16) coming before the issuance of the PIP).

Instead, there are only two emails Ms. Clark cites to in order to show her supervisors knew of her disabilities sent before the issuance of her PIP. One email merely requests a day off for medical tests and does not mention her anxiety, depression, or ADHD—her disabilities protected by law. (See Doc. 33-12). The other email, she completely mischaracterizes. In this one, she states, "It feels good living without an FMLA for anxiety and depression. I feel so much healthier, mentally, and physically being on a normal sleep schedule." (Doc. 33-16). Even in the light most favorable to Ms. Clark, this at most establishes that she had some medical issues in the past. It does not give rise to the inference she will have issues in the future as she reports to be living *without* anxiety and depression at that time.

Ms. Clark's last resort are her unsubstantiated denials that the events leading to the PIP took place. (Doc. 33-1 ¶¶ 76-79). Yet, she offers no explanation or context for the contemporaneous email sent by co-worker Ms. Dombrowski recounting several serious issues with Ms. Clark's job performance. (Doc. 26-1 at Appx. 617-20). Nor does Ms. Clark ever establish Ms. Dombrowski knew Ms. Clark had protected disabilities. Finally, in that email chain, Ms. Clark's supervisor Mr. Rhoads wrote "I will add this to my write up on Kim, she is aware I am doing so, and that if things do not change, she will be left [sic] go." (Id. at Appx. 616). Notably, this email was sent on March 2, 2022. This is three days *before* Ms. Clark sent an email to Ms. Pacovsky mentioning anxiety, depression, and the FMLA. (See Doc. 33-16).

In sum, Defendants' given rationale for not hiring Ms. Clark for the RN Lead role was always documented performance issues. Ms. Clark offers no response to the evidence corroborating those performance issues or ever establishes prejudice by her co-worker who noted these issues. Moreover, she fails to establish the authors of her PIP knew Ms. Clark suffered from a disability. All she rests upon is her statements that she told her supervisors of her condition and that the incidents regarding her poor performance did not occur. Yet, bare denials and allegations are insufficient to defeat a motion for summary judgment. See D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 268-69 (3d Cir. 2014). Accordingly, Ms. Clark cannot show the PIP was pretextual or that she was terminated because of her disability, and so her ADA and PHRA discrimination and retaliation claims fail.[8]

### B. FMLA Claims

Ms. Clark raises two claims under the FMLA: (1) defendants interfered with her rights under the FMLA, and (2) defendants retaliated against her for exercising her FMLA rights.

To establish a claim for FMLA retaliation, a plaintiff must show that "(1) she invoked her right to FMLA qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012). Since it has been established Defendants had legitimate

---

[8] This includes her claims against the individual defendants. See Long v. Spalding Auto. Inc., 337 F. Supp. 3d 485, 494 (E.D. Pa. 2018).

justifications for both issuing Ms. Clark the PIP and her termination, her retaliation claim cannot survive summary judgment. See Capps v. Mondelez Global, LLC, 847 F.3d 144, 156 n.12 (3d Cir. 2017) (noting that ADA and FMLA claims are analyzed under the same McDonnell Douglas framework); Naber v. Dover Healthcare Assocs. Inc., 473 F. App'x 157, 161 (3d Cir. 2012) (non-precedential).

To establish an FMLA interference claim, a plaintiff must show that (1) she was an eligible employee under the act, (2) the defendant was subject to the act, (3) she was entitled to FMLA leave, (4) she gave notice to the defendant of her intent to use leave, and (5) the defendant denied her benefits she was entitled to under the act. Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014). In contrast to FMLA retaliation, an interference claim "is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Capps, 857 F3.d at 155. Interfering with those rights includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).[9]

Here, Ms. Clark first argues Defendants interfered with her FMLA rights by failing to notify her of her FMLA rights. (Doc. 18, ¶ 92). However, Ms. Clark fails to identify what information Defendants failed to provide her with and how this failure caused her harm. Further, every time Ms. Clark requested FMLA leave, such a request was approved. As such, summary judgment shall be granted in favor of

---

[9] Defendants have not raised any arguments against the application or legitimacy of 29 C.F.R. § 825.220(b), which Ms. Clark cited to in her briefing. (See Doc. 33 at 38).

16

Defendants on this claim. See Kimes v. Univ. of Scranton, 126 F. Supp. 3d 477, 501 (M.D. Pa. 2015) (citing Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 142 (3d Cir. 2004)).

Finally, Ms. Clark asserts Defendants discouraged her from exercising her FMLA rights. (Doc. 18, ¶ 92). In support, Ms. Clark points her finger at two people: Ms. Napikoski and Ms. Pacovsky. (See Doc. 33 at 38). Defendants largely do not address the interference aspect of Ms. Clark's claim in the briefing, nor do they provide any other explanation other than denying such accusations took place. (See Doc. 28 at 31 n.6; Doc. 34 at 20-21). Contrary to Defendants' assertions, the mere fact that she eventually exercised her FMLA rights has no bearing on whether Defendants' conduct discouraged her from exercising those rights. See Woods v. AstraZeneca Pharms., L.P., 659 F. Supp. 3d 512, 538-39 (M.D. Pa. 2023).

Starting with Ms. Pacovsky, Ms. Clark's central claim against her is that she was "treated poorly based on Pacovsky's expressed FMLA animus." (Doc. 33 at 38). To the extent her poor treatment is in connection to the issuance of the PIP and Geisinger's decision to not hire Ms. Clark for another role, those actions would fall under retaliation and have already been addressed above. Moving to Ms. Pacovsky's supposed "animus," it is true that in an email chain, she emailed a colleague stating she did not know how Ms. Clark's leave kept getting approved. (Doc. 33-21). Yet, Ms. Clark was not part of that email chain, so it is impossible for

17

that comment to have discouraged her from utilizing her FMLA rights.[10] Ms. Clark fails to identify any other actions by Ms. Pacovsky that could be seen as discouraging her to avail herself of her FMLA rights and therefore, summary judgment is warranted with respect to Ms. Pacovsky on the FMLA interference claim.

The story is different with Ms. Napikoski. Ms. Clark recounts Ms. Napikoski telling her "you can't just continue to take FMLA" and "you don't want to put more burden on your co-workers and other nurses." (Clark Dep. 58:13-25; 59:4-11). Additionally, Ms. Clark's performance evaluation in 2016 notes she was "unreliable" due her FMLA leave, (Doc. 33-6 at DEF 523), and her 2019 evaluation comments her "[i]ntermittent FMLA was noted earlier," (id. at DEF 558). Taken together, Ms. Clark has demonstrated a triable case about whether these comments discouraged her from utilizing her FMLA rights. Woods, 659 F. Supp. 3d at 539. And so, summary judgment will be denied on this claim.[11]

Before concluding, it is worth acknowledging the events with Ms. Napikoski occurred several years before Ms. Clark filed her complaint. Though Defendants raised a statute of limitations defense in their answer, (Doc. 19 at 20), they never

---

[10] Indeed, it appears Ms. Clark did not learn of this email exchange until after filing this lawsuit as during her deposition (occurring on April 10th, 2024), when asked if Ms. Pacovsky made any comments about her disabilities or mental health, Ms. Clark did not mention the email, rather she said "I never had a lot of communications with [Ms. Pacovsky]." (Clark Dep. 140:22-141:11).

[11] Though, Ms. Napikoski was not named as a defendant in the complaint, and she would be the only individual against whom an FMLA interference claim could be made. It is therefore only against Geisinger that Ms. Clark may assert an interference claim.

briefed the issue. The court therefore treats this defense as abandoned. See Harrisburg Hosp. v. Thornburgh, 616 F. Supp. 699, 709 n.9 (M.D. Pa. 1985), aff'd, 791 F.2d 918 (treating issues raised in pleadings but not briefed as abandoned).

## IV.     Conclusion

As to Ms. Clark's claim to interference of her FMLA rights, Defendants' motion for summary judgement (Doc. 25) is denied as to Geisinger. As to the individuals named in the complaint, the FMLA retaliation claims, and the ADA and PHRA claims, summary judgment is granted in favor of Defendants. An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    July 3rd, 2025